UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

REGINALD R.,[1]
                                        Plaintiff                    DECISION and ORDER

-vs-                                                                 6:21-CV-06326 CJS

COMMISSIONER OF SOCIAL
SECURITY,
                                        Defendant.
_____

INTRODUCTION

This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final determination of the Commissioner of Social Security ("Commissioner" or "Defendant") which denied the application of Plaintiff for Social Security Disability Insurance ("SSDI") benefits and Supplemental Security Income ("SSI") benefits.   The Administrative Law Judge ("ALJ") found, at the second step of the five-step sequential evaluation used for disability claims, that none of Plaintiff's physical or mental impairments was severe, and that Plaintiff was therefore not disabled.   Now before the Court is Plaintiff's motion (ECF No. 8) for judgment on the pleadings and Defendant's cross-motion (ECF No. 10) for the same relief.   Plaintiff maintains that the ALJ's decision is affected by legal error, due to failures to develop the record, and is not supported by substantial evidence.   However, for reasons discussed below the Court disagrees, and, consequently, Plaintiff's application is denied, and Defendant's application is granted.

_____

[1]  The Court's Standing Order issued on November 18, 2020, indicates in pertinent part that, "[e]ffective immediately, in opinions filed pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), in the United States District Court for the Western District of New York, any non-government party will be identified and referenced solely by first name and last initial."

1

STANDARDS OF LAW

The Commissioner decides applications for disability benefits using a five-step sequential evaluation process:

> A five-step sequential analysis is used to evaluate disability claims. *See* 20 C.F.R. §§ 404.1520, 416.920.   First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the Commissioner next considers whether the claimant has a severe impairment[2]  which significantly limits his physical or mental ability to do basic work activities.[3] If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in the regulations [or medically equals a listed impairment].   Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity [("RFC")] to perform his past work.[4] Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform. The claimant bears the burden of proof as to the first four steps, while the Commissioner bears the burden at step five.[5]

---

[2]  "At step two, the ALJ must determine whether the claimant has a 'severe medically determinable physical or mental impairment that meets the duration requirement in [20 C.F.R.] § 404.1509, or a combination of impairments that is severe and meets the duration requirement.' *Id*. If not, the claimant is deemed not disabled, and the inquiry ends." *Koch v. Colvin*, 570 F. App'x 99, 101 (2d Cir. 2014); *see also*, 20 C.F.R. § 404.1520(a)(4)(ii) ("At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement in § 404.1509, or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.").

[3]  The Commissioner's Regulations define basic work-related activities as follows: "Basic work activities. When we talk about basic work activities, we mean the abilities and aptitudes necessary to do most jobs. Examples of these include— (1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) Capacities for seeing, hearing, and speaking; (3) Understanding, carrying out, and remembering simple instructions; (4) Use of judgment; (5) Responding appropriately to supervision, co-workers and usual work situations; and (6) Dealing with changes in a routine work setting."   20 C.F.R. § 404.1522 (West 2023).

[4]  Residual functional capacity "is what the claimant can still do despite the limitations imposed by his impairment." *Bushey v. Berryhill*, 739 F. App'x 668, 670–71 (2d Cir. 2018) (citations omitted); *see also*, 1996 WL 374184, Titles II & Xvi: Assessing Residual Functional Capacity in Initial Claims, SSR 96-8P (S.S.A. July 2, 1996).

[5]  "The Commissioner's burden at step five is to show the existence of possible employment for an individual with the RFC determined by the ALJ in the fourth step of the sequential analysis." *Smith v. Berryhill*, 740 F. App'x 721, 726–27 (2d Cir. 2018) (citation omitted). The ALJ typically does this either by resorting to the medical vocational "grids" or, where the claimant has a non-exertional impairment, by taking testimony from a vocational expert. *See, Bapp v. Bowen*, 802 F.2d 601, 603 (2d Cir. 1986) ("[T]he mere existence of a nonexertional impairment does not automatically require the production of a vocational expert nor preclude reliance on the guidelines. A more

*Colvin v. Berryhill*, 734 F. App'x 756, 758 (2d Cir. 2018) (citations and internal quotation marks omitted).

An unsuccessful claimant may bring an action in federal district court to challenge the Commissioner's denial of the disability claim.   In such an action, "[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C.A. § 405(g) (West).   Further, Section 405(g) states, in relevant part, that "[t]he findings of the Commissioner of Social security as to any fact, if supported by substantial evidence, shall be conclusive."

The issue to be determined by the court is whether the Commissioner's conclusions "are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard." *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998); *see also, Barnaby v. Berryhill*, 773 F. App'x 642, 643 (2d Cir. 2019) ("[We] will uphold the decision if it is supported by substantial evidence and the correct legal standards were applied.") (citing *Zabala v. Astrue*, 595 F.3d 402, 408 (2d Cir. 2010) and *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012).").

"First, the [c]ourt reviews the Commissioner's decision to determine whether the Commissioner applied the correct legal standard." *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999); *see also, Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) ("[W]here an error of law has

---

appropriate approach is that when a claimant's nonexertional impairments significantly diminish his ability to work—over and above any incapacity caused solely from exertional limitations—so that he is unable to perform the full range of employment indicated by the medical vocational guidelines, then the Secretary must introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which claimant can obtain and perform.").

been made that might have affected the disposition of the case, this court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the [administrative law judge] [("]ALJ[)"]. Failure to apply the correct legal standards is grounds for reversal.") (citation omitted).

If the Commissioner applied the correct legal standards, the court next "examines the record to determine if the Commissioner's conclusions are supported by substantial evidence." *Tejada v. Apfel*, 167 F.3d at 773.   Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. (citation omitted).

> The substantial evidence standard is a very deferential standard of review—even more so than the 'clearly erroneous' standard, and the Commissioner's findings of fact must be upheld unless a reasonable factfinder would have to conclude otherwise." *Brault v. Social Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (per curiam) (emphasis in original). "An ALJ is not required to discuss every piece of evidence submitted, and the failure to cite specific evidence does not indicate that such evidence was not considered." *Id*.

*Banyai v. Berryhill*, 767 F. App'x 176, 177 (2d Cir. 2019), as amended (Apr. 30, 2019) (internal quotation marks omitted); *see also, Snyder v. Comm'r of Soc. Sec*., No. 22-277-CV, 2023 WL 1943108, at *1 (2d Cir. Feb. 13, 2023) ("While the substantial evidence standard requires we find more than a mere scintilla of support for the Commissioner's decision, it is still a very deferential standard of review requiring us to uphold the Commissioner's findings unless a reasonable factfinder would *have to conclude otherwise*.") (emphasis in original; citations and internal quotation marks omitted).

In applying this standard, a court is not permitted to re-weigh the evidence. *See, Krull v.*

*Colvin*, 669 F. App'x 31, 32 (2d Cir. 2016) ("Krull's disagreement is with the ALJ's weighing of the evidence, but the deferential standard of review prevents us from reweighing it."); *see also, Riordan v. Barnhart*, No. 06 CIV 4773 AKH, 2007 WL 1406649, at *4 (S.D.N.Y. May 8, 2007) ("The court does not engage in a *de novo* determination of whether or not the claimant is disabled, but instead determines whether correct legal standards were applied and whether substantial evidence supports the decision of the Commissioner.") (citations omitted). "Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings must be given conclusive effect so long as they are supported by substantial evidence." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (internal quotation marks omitted). "In other words, this Court must afford the Commissioner's determination considerable deference, and 'may not substitute its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a *de novo* review.'" *Melia v. Colvin*, No. 1:14-CV-00226 MAD, 2015 WL 4041742, at *2 (N.D.N.Y. July 1, 2015) (quoting *Valente v. Sec'y of Health & Human Servs.*, 733 F.2d 1037, 1041 (2d Cir.1984)).

## FACTUAL and PROCEDURAL BACKGROUND

The reader is presumed to be familiar with the factual and procedural history of this action, which is set forth in the parties' papers. The Court will refer to the record only as necessary to rule on the alleged errors identified by Plaintiff.

On June 12, 2018, Plaintiff, then age 43,[6] with a high school (GED) education, applied for SSDI and SSI benefits, claiming that that he became disabled on December 20, 2017.[7]

---

[6] The record indicates that Plaintiff was born in August 1974.

[7] Prior to that date, Plaintiff's earnings for the prior three years, 2015-2017 were, respectively, $4,759, $2,421, and $2,508. Plaintiff's highest earnings in any prior year appears to have been $24,000, though in most years he

Plaintiff's last three reported jobs were automobile detailer, health services laborer, and loader/packer for United Parcel Service ("UPS"). (Tr. 275).   When explaining his employment history to a mental health therapist, Plaintiff indicated that he left the automobile detailer and health services laborer jobs for reasons unrelated to any physical or mental impairment.[8]

When applying for disability benefits, Plaintiff listed his disabling medical conditions as "anxiety (panic disorder, antisocial disorder)," "depression," "insomnia," "neck injury," and "copd/asthma." (Tr. 274).   Subsequent to his application, Plaintiff told the Social Security administration that he also suffers from "seizures" periodically, though he has no official diagnosis for that condition, since no medical provider has observed such a seizure. (Tr. 292). Plaintiff evidently believes that his "seizures" are related to his prior neck surgery, though a doctor indicated that such episodes were likely "cough induced pre-syncope,"[9] caused by smoker's cough. (Tr. 325).[10]   Still later, during the administrative process, Plaintiff had arthroscopic surgery on his right hip, from which he recovered without complications.   However, he maintains that his hip condition is an additional disabling condition, since he had experienced pain for several years prior to surgery.

On October 3, 2018, the Commissioner denied Plaintiff's claims for SSDI and SSI benefits

---

had reported earnings below $15,000.

[8] When asked to state his employment history in 2017, Plaintiff gave four jobs:   Health care worker/CAN, at which he worked for six years; "Hammer Packaging," a "temp job" at which he worked for three months; "car detailing," at which he worked for eight years; and "Kodak paper mill," at which he worked for three years.   He stated that he left the health care job because his "daughter's mom did not like him working with a lot of women"; that he left the temp job because "people are full of shit/employees did not care"; that the left the car detailing job because he was "violated by probation/they were "giving him the run around"; and that he left the paper mill because he "did not like the job, pay was not good." (Tr. 1654).

[9] *See,*Tr. 1619 ("Syncope is a medical term for fainting or passing out.").

[10] *See also*, Tr. 329 (""Blacking out' will occur after coughing.   . . .   Does think coughing spells are less frequent since he started Symbicort.")

6

initially,[11] after which Plaintiff requested a hearing before an ALJ.   Plaintiff, who was represented by an attorney, consented to a hearing by telephone, due to the Covid-19 pandemic. On May 21, 2020, the ALJ conducted the hearing, at which Plaintiff and a vocational expert ("VE") testified.    Plaintiff testified, in pertinent part, that he left his last job, at UPS, in December, 2017, because "some of the packages" were too heavy for him to lift, and because he was having trouble lifting his right leg due to hip pain. (Tr. 106) ("I found out my leg wasn't lifting like it should."); (*Id.*) ("And my hip – the hip started bothering me.").   Plaintiff further testified that he had neck pain every day, for "more than half" of each day. (Tr. 107).   Plaintiff stated that his neck pain was "sharp" and made him feel as if he would collapse on the ground. (Tr. 107).

At the hearing, Plaintiff's counsel informed the ALJ that there were still some medical records which had not been received,[12] and the ALJ agreed to leave the record open for two weeks. (Tr. 89).   On June 3, 2020, Plaintiff's counsel wrote to the ALJ, indicating that all outstanding records were now part of the record and requesting that the ALJ issue a decision. (Tr. 316) ("As you know, you have already conducted a hearing for the above referenced claimant.   *This is a courtesy letter to advise you that the records outstanding at the time of the hearing have been submitted, and we request a hearing decision be issued.*") (emphasis added). The ALJ admitted all evidence submitted to him by Plaintiff, of which he was aware. (Tr. 17).[13]

---

[11] In connection with the initial denial, agency physician R. Abueg, M.D. ("Abueg") found, based on the medical evidence of record and a report from a psychological consultative examination, that Plaintiff's conditions were not severe.   Additionally, agency review psychologist E. Kamin, Ph.D. ("Kamin") performed a Psychiatric Review Technique ("PRT") assessment and found that Plaintiff had "no limitation" with regard to understanding, remembering or applying information and concentrating, persisting or maintaining pace, and "mild" limitation with regard to interacting with others and adapting or managing oneself. (Tr. 129-130).

[12] Counsel specifically referred to records from Rochester General Hospital and Huther Doyle Substance Abuse Services. (Tr. 89).

[13] As will be discussed below, additional evidence was subsequently and untimely submitted, almost simultaneously with the issuance of the ALJ's decision, which the Appeals Council found would not have changed

On June 18, 2020, the ALJ issue a written decision denying Plaintiff's claims. (Tr. 17-26). At the first step of the five-step sequential evaluation, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged disability onset date.   At the second step, the ALJ found that Plaintiff had the following medically determinable impairments: "asthma; COPD; anxiety; depression; obesity; neck pain post remote ACDF surgery; GERD; hip pain status post surgery." (Tr. 20).   However, the ALJ determined that none of Plaintiff's medically determinable impairments was severe.   Specifically, the ALJ found that none of Plaintiff's impairments, either singly or combined, significantly limited his ability to perform basic work-related activities for 12 consecutive months.   Consequently, the ALJ found Plaintiff "not disabled" at the second step of the five-step sequential evaluation, and did not proceed to the later steps.

In finding that Plaintiff's impairments were not severe, the ALJ first reviewed Plaintiff's subjective complaints, noting, for example, that Plaintiff claimed the following: That he has had ongoing neck pain following cervical fusion surgery in 2014; that he cannot turn his head fully; that he had "passed out" at work due to "seizure like events"; that he has intermittent sharp pain that makes him feel like he will fall to the ground; that he cannot lift his right arm above his head without pain; that he cannot sit at a computer for longer than 20 minutes; that he needs hip and shoulder replacement surgeries; that he cannot lift his leg due to hip pain; that he has headaches 3-4 times per week; that he has more bad days than good days; that he has anxiety and depression; that he has random symptoms of COPD and asthma; that he might be able to lift 30 pounds; that he can stand for only 20 minutes; and that he can walk for only 10-15 minutes.

the ALJ's decision.

8

(Tr. 21).

However, the ALJ found that Plaintiff's subjective complaints were not entirely consistent with the evidence, and that Plaintiff's impairments were not severe, for various reasons. Primarily, the ALJ stated that despite Plaintiff's statements, the medical evidence showed that his impairments never significantly affected his functioning, and that to the extent there had been any limitation, it was only temporary and therefore did not meet the durational requirements for disability:

> The record does not demonstrate any particular medical impairment that has lasted for more than 12 continuous months.   The record does show a continuing diagnosis of cervical spine issues with a history of multi-level ACDF, but there is no specific evidence of physical limitations, after his alleged onset date of December 17, 2017.   No asthma or COPD exacerbations are noted.   The claimant had right hip surgery in February 2020, but there is no evidence to suggest that this impairment has lasted 12 months.   The treatment record shows very little treatment in 2019, suggesting the claimant's symptoms were minimal. By April 2020, the claimant had already reported significant improvement in his hip pain.

(Tr. 21).   Additionally, the ALJ indicated that Plaintiff's selection of December 20, 2017, as his disability onset date was puzzling, since "there is nothing in the record to suggest that his condition worsened at that time, to the degree alleged at the hearing," and, instead, in September 2017, "he had a normal mental and physical exam, except for some tenderness in his ear." (Tr. 21-22).[14]

The ALJ further noted that on March 14, 2018, shortly after the alleged disability onset date, Plaintiff had a physical exam that, except for some trapezius muscle spasm, was normal,

---

[14] As discussed further below, Plaintiff had numerous normal physical and mental exams, both before and after the alleged disability onset date.

including full range of movement in the right arm, normal muscle strength bilaterally, intact neurological functioning, and normal mental status. (Tr. 22).   The ALJ further indicated that in June 2018, Plaintiff had another examination that was essentially normal, including "no joint pain and no anxiety or depression." (Tr. 22) ("The claimant's physical exam was normal.   He had normal muscle tone, normal gait, despite some decreased sensation in his right leg.   Asthma was noted as 'mild' and well controlled.   His GERD was improved and he was advised to exercise.   *No limitations were noted*.") (emphasis added).

Additionally, the ALJ observed that in October 2018, during an ER visit after Plaintiff had fallen down some stairs, he appeared well, denied any worsening of symptoms, ambulated without any apparent deficits, and had normal range of motion in all extremities. (Tr. 22). Indeed, the only positive finding on that occasion was some neck tenderness. (*Id*.).   Moreover, a month later, in November 2018, during another ER visit, Plaintiff reported pain and decreased range of motion in his *left* hip (not the hip upon which he later had surgery), but upon examination, except for some decreased range of motion in the left hip his physical exam was normal. (Tr. 22).

The ALJ further noted that Plaintiff attended physical therapy in 2018 and 2019, but that the notes from such treatment did not show any significant limitations.   For example, that ALJ stated that in August 2018 Plaintiff sought physical therapy complaining of cervical pain and right-sided weakness, but that in June 2018, he'd had a normal physical examination, as noted earlier. (Tr. 22).   The ALJ further observed that physical therapy notes in July 2019 reported normal strength and range of motion despite Plaintiff's complaints of pain in his shoulder and right hip. (Tr. 22-23).

Regarding Plaintiff's arthroscopic right hip surgery, which was performed in February 2020, the ALJ noted that Plaintiff's assertion that he had been suffering with pain for three years prior to such surgery was inconsistent with the record. (Tr. 23) ("[I]n his September 2018 hospital admission, the claimant had normal range of motion and was ambulatory, which is not consistent with his allegations of long-standing hip pain.").   The ALJ further observed that treatment notes indicated Plaintiff improved quickly after the surgery. (Tr. 23) ("He underwent physical therapy, after his hip surgery, and made very good progress.   Although he was complaining of soreness, his actual exam noted almost normal functioning, in March 2020.   Even right after his surgery in February 2020, the claimant had normal strength in his legs, despite reduced range fo motion of the hip.   By May 2020, the claimant noted only slight pain with therapy.  . . .   The claimant's hip issue has not lasted 12 continuous months or more and does not meet the durational requirement.").

Finally, the ALJ noted that despite Plaintiff's complaints about his other conditions, including asthma, anxiety, back pain, and GERD, his physical and mental examinations were consistently normal. (Tr. 23) ("He had normal range of motion of the neck and spine.   Normal breathing and normal gait, with normal range of motion of all extremities and normal strength. His mental status was also normal.").   The ALJ summed up these observations by stating that, "[t]he claimant's medical record shows acute complaints of various issues, but none of the claimant's impairments have actually impaired him for a period of 12 continuous months or more. His neck issues resolved after his surgery.   He sustained several falls, mostly related to his drinking, not seizures.   The claimant recovered after treatment, in less than 12 months.").

Regarding Plaintiff's mental impairments, the ALJ further found that the medical evidence

showed no significant work-related limitation.   In that regard, the ALJ partially credited the opinion of consultative psychological examiner Adam Brownfeld, Ph.D. ("Brownfeld"), who examined Plaintiff on August 20, 2018, at the Commissioner's request.   Brownfeld reported that Plaintiff had fluent and clear speech; coherent and goal-directed thought processes without hallucinations, delusions or paranoia; full affect; euthymic mood; intact attention and concentration; intact memory; average cognitive functioning; fair insight; and fair judgment. (Tr. 437-38).   Brownfeld's medical source statement was as follows:

> No evidence of limitation in understanding, remembering, and applying simple and complex directions and instructions, using reasoning and judgment to make work-related decisions, interacting adequately with supervisors, co-workers, and the public; sustaining concentration and performing tasks at a consistent pace; sustaining an ordinary routine and regular attendance at work, maintaining personal hygiene and appropriate attire, and being aware of normal hazards and taking appropriate precautions.   He is moderately limited in regulating emotions, controlling behaviors, and maintaining well-being.

> The results of the evaluation appear to be consistent with psychiatric and substance abuse problems, but in [themselves], they did not appear to be significant enough to interfere with the claimant's ability to function on a daily basis.

(Tr. 438).   The ALJ indicated that Brownfeld's opinion was "partially persuasive."   However, the ALJ rejected Brownfeld's assertion that Plaintiff would be "moderately limited in regulating emotions, controlling behaviors, and maintaining well-being," since, during the examination, "[t]here was no indication of any significant limitation in his ability to regulate emotion, control behavior or maintain wellbeing, due to mental impairment," and since the finding was also inconsistent with the rest of the record. (Tr. 24) (Observing that the limitations were "not consistent with the record or the actual exam.").

The ALJ also observed that the State Agency Assessment, that Plaintiff's mental

impairments were not severe, was "persuasive and supported by the record and the Claimant's mostly normal exams." (Tr. 24).

The ALJ concluded that Plaintiff had "no limitation" in the functional area of "understanding, remembering, and applying information," and only "mild limitation" in the functional areas of "interacting with others," "concentrating, persisting and maintaining pace," and "adapting or managing oneself." (Tr. 25).   In this regard, the ALJ reiterated that Plaintiff's "mental status exams noted normal functioning." (Tr. 25).

Plaintiff appealed the ALJ's decision,[15] however, the Appeals Council declined to review the ALJ's decision.   In doing so, the Appeals Council noted that on June 16, 2020, Plaintiff's counsel had sent additional records, consisting of 49 pages of records from Huther Doyle Substance Abuse Services, for the period May 9, 2019, through February 10, 2020, to the Commissioner of Social Security's "Office of Disability Adj & Review." (Tr. 31-80).   Plaintiff sent those records two days before the ALJ issued his decision, and almost a month after he had notified the ALJ that all records had been submitted. There is no indication that the ALJ actually saw that particular batch of records, though he had two other sets of records from Huther Doyle.[16]   The Appeals Council indicated that it had considered the additional submission, but that it "not show a reasonable probability that it would change the outcome of the decision." (Tr. 3).[17]   Consequently, the ALJ's decision became the Commissioner's final decision.

On April 16, 2021, Plaintiff commenced this action, contending that the ALJ's decision is

---

[15] The appeal did not allege any error related to a failure to develop the record.

[16] Tr. 440-486, 491-627.

[17] Plaintiff has not challenged that ruling by the Appeals Council in this action.   Instead, he argues that the ALJ erred by failing to consider the records, though without acknowledging that the records were untimely submitted and then considered by the Appeals Council.

affected by legal error, due to a failure to develop the record, and is not supported by substantial evidence.

Regarding the alleged legal error, Plaintiff asserts that "[t]he ALJ failed to meet his affirmative duty to develop the record relating to medical opinion evidence and obvious gaps in the treatment evidence."[18]   More specifically, Plaintiff maintains that "the record does not contain an opinion from a treating or examining source regarding physical abilities and limitations.   The record is further missing treatment notes from multiple treating sources."[19]

With regard to the first alleged error, Plaintiff indicates that "the ALJ was required to obtain a statement from a treating source, or alternatively, order a consultative examination," since "[t]he record does not contain sufficient evidence relating to Plaintiff['s] functioning."[20]   Plaintiff contends that it was improper for the ALJ to rely on the findings in his treatment notes. *See*, ECF No. 8-1 at p. 19 ("[T]his is not a situation where the limitations were so minimal [that] the ALJ could make a common sense assessment relating to Plaintiff's functioning.   As a result, the ALJ was required to obtain additional medical opinion evidence.").

With regard to the second alleged legal error, Plaintiff insists that "the record shows gaps in the treatment evidence."[21]   On this point, Plaintiff contends that treatment notes suggest that the following records may be missing: Records from Plaintiff's primary care doctor between June 2018 and August 2018; any treatment notes from Evan Briggs, RPA-C, who apparently referred Plaintiff to physical therapy; any treatment notes from Rami Eshaar, M.D., the surgeon who

---

[18]  ECF No. 8-1 at p. 12.
[19]  ECF No. 8-1 at p. 13.
[20]  ECF No. 8-1 at p. 14.
[21]  ECF No. 8-1 at p. 19.

performed Plaintiff's hip surgery, from either before or after the surgery; and any notes from Kate Conlon, D.O., who also referred Plaintiff to physical therapy in 2019.[22]   Plaintiff argues that such notes, if they exist, may contain evidence of limitations which would disprove the ALJ's finding that Plaintiff's physical limitations were not severe, and that the ALJ therefore had a duty to obtain the records, even though Plaintiff's counsel at the time indicated that the record was complete.   In particular, Plaintiff argues that such records could possibly show that the ALJ was mistaken in finding that Plaintiff's hip impairment had not persisted for 12 months.

Plaintiff contends that there was also a gap in the record concerning his mental impairments, which the ALJ had a duty to develop.   In particular, Plaintiff contends that the ALJ erred in assessing Dr. Brownfeld's opinion, since he was required to consider both the supportability and consistency of the opinion, but only considered the supportability factor. (ECF No. 8-1 at p. 24) ("Although the ALJ later summarized a portion of the mental health treatment notes, the ALJ never compared Dr. Brownfeld's opinion to such findings.").   Plaintiff further contends that the record was missing some records from Huther Doyle.   On this point, Plaintiff asserts that, "[t]he record was held open, but the records [(from Huther Doyle)] were never submitted," even though, as mentioned earlier, Plaintiff's counsel expressly told the ALJ that all such records had been submitted and that the ALJ could therefore issue a decision.[23]

Apart from these alleged errors of law, Plaintiff asserts that the ALJ's determination is not supported by substantial evidence.   Plaintiff asserts, for example, that the record contains some

---

[22] ECF No. 8-1 at p. 20.
[23] Again, Plaintiff is incorrect to assert that the Huther Doyle records were never submitted.   They were submitted late, and the Appeals Council found that they would not have changed the ALJ's decision.

positive findings from mental status examinations that the ALJ did not discuss.[24]   Plaintiff further contends that the mental health treatment records actually do not show "improvement and noncompliance," contrary to what the ALJ found.[25]   Plaintiff also maintains that it was erroneous for the ALJ to rely upon Plaintiff's ability to function at home and in the community, since such functioning is different that what might be required at a job.

Defendant disagrees and contends that the ALJ's decision is not affected by legal error and is supported by substantial evidence.   Defendant notes, first, and Plaintiff does not disagree, that the Commissioner's "new" regulations apply to this action.   Defendant further contends that such regulations do not require the ALJ to obtain a medical opinion, and that Second Circuit caselaw also does not necessarily require remand simply because there is no such opinion evidence.[26]   Defendant also maintains that the lack of a medical opinion concerning Plaintiff's physical abilities does not render the record incomplete or require a remand in this action, since the medical record, "consist[ing] of about 1,500 pages of medical notes," provided the ALJ with "enough medical evidence to make a decision about disability."[27]

DISCUSSION

The ALJ's Alleged Failure to Develop the Record

As discussed earlier Plaintiff maintains that the ALJ committed several distinct errors of law relating to a failure to develop the record.   The legal principles generally applicable to the ALJ's duty to develop the record are well settled:

[A]n "ALJ, unlike a judge in a trial, must on behalf of all claimants ... affirmatively

---

[24]  ECF No. 8-1 at p. 27-28.
[25]  ECF No. 8-1 at p. 28.
[26]  ECF No. 10-1 at p. 6 (citing *Tankisi v. Commissioner*, 521 F.App'x 29, 33-34 (2d Cir. 2013) ("*Tankisi*") and *Pellam v. Astrue*, 508 F.App'x 87, 90 (2d Cir. 2013) ("Pellam").
[27]  ECF No. 10-1 at p. 7.

develop the record in light of the essentially non-adversarial nature of a benefits proceeding." *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 508-509 (2d Cir. 2009) (citations and alterations omitted). "[W]here there are deficiencies in the record, an ALJ is under an affirmative obligation to develop a claimant's medical history even when the claimant is represented by counsel or by a paralegal." *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999) (internal alterations and quotation marks omitted); *see Eusepi v. Colvin*, 595 F. App'x 7, 9 (2d Cir. 2014) ("The ALJ's general duty to develop the administrative record applies even where the plaintiff is represented by counsel, but the agency is required affirmatively to seek out additional evidence only where there are 'obvious gaps' in the administrative record."); *see Lowry v. Astrue*, 474 F. App'x 801, 804 (2d Cir. 2012).

However, "where there are no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim." *Swiantek* [*v. Commissioner,*] 588 F. App'x 82, 84 (2d Cir. 2015) (quoting *Rosa*, 168 F.3d at 79 n. 5); *see Janes v. Berryhill*, 710 F. App'x 33 (2d Cir. 2018) (ALJ not required to develop record where evidence presented is adequate for the ALJ to make a determination).

*Derek W. v. Comm'r of Soc. Sec.*, No. 1:20-CV-1437 (WBC), 2022 WL 16856672, at *3 (W.D.N.Y. Nov. 10, 2022).

> *The Alleged Failure to Obtain Opinion Evidence Concerning*
> *Plaintiff's Physical Limitations*

Plaintiff first contends that the ALJ failed to develop the record, since he did not obtain a medical opinion concerning Plaintiff's physical limitations.   In that regard, as noted earlier, the Commissioner obtained a consultative psychological examination, but not a consultative physical examination.   Rather, the ALJ based his finding at step two of the sequential evaluation (that none of Plaintiff's physical impairments was severe) on office notes and hospital notes that mostly reported normal findings from physical examinations.   Plaintiff maintains that was reversible error, arguing that,

> the ALJ was required to obtain a statement from a treating source, or alternatively,
> [to] order a consultative examination.[28]  . . .   It is unclear why a consultative
> psychiatric examination was performed but not a consultative physical
> examination.   The record does not contain sufficient evidence relating to
> Plaintiff['s physical] functioning.

ECF No. 8-1 at p. 14.

Defendant disagrees, and contends that the record was sufficient to allow that ALJ to see

that Plaintiff's physical impairments were not severe:

> In this situation, the medical record consists of about 1,500 pages of medical notes
> despite not having opinion evidence from Plaintiff's own sources.  . . . [W]hile
> Plaintiff asserts that a physical consultative examination should have been
> requested, it was not required in this instance because the ALJ had enough
> medical evidence to make a decision about disability.

ECF No. 10-1 at p. 6.

The Court agrees with Defendant that the ALJ did not commit reversible error in failing to

obtain a medical opinion concerning Plaintiff's physical abilities, since the voluminous record

was replete with normal physical exam findings from treating physicians.   In that regard, the

Second Circuit has held that although the Commissioner's prior regulations "seem[ed] to impose

on the ALJ a duty to solicit such medical opinions," "remand [wa]s not always required when an

ALJ fail[ed] in his duty to request opinions, particularly where . . . the record contain[ed] sufficient

evidence from which an ALJ c[ould] assess the petitioner's residual functional capacity." *Tankisi*

*v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 33-34 (2d Cir. 2013) (citing 20 C.F.R. § §

404.1513(b)(6), 416.913(b)(6)).   Under the current regulations, the same rule generally applies:

As an initial matter, "[t]he Second Circuit has held that it is not *per se* error for an

---

[28]  *See, e.g.*, ECF No. 8-1 at p. 19 ("If a statement could not be procured from a treating source, the ALJ could
have obtained a consultative . . . evaluation.").

ALJ to make a disability determination without having sought the opinion of the claimant's treating physician." *Delgado v. Berryhill*, No. 3:17 CV 54(JCH), 2018 WL 1316198, at *8 (D. Conn. Mar. 14, 2018) (internal quotations and citations omitted). "[A] medical source statement is not necessarily required to fully develop the record where 'the record contains sufficient evidence from which an ALJ can assess the [claimant's RFC].' " *Crespo v. Comm'r of Soc. Sec.*, No. 18 CV 435(JAM), 2019 WL 4686763, at *3 (D. Conn. Sept. 25, 2019) (quoting *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 34 (2d Cir. 2013)). The "sufficient evidence" standard is satisfied when the medical records considered by an ALJ are "extensive," "voluminous," and include "an assessment of [the claimant's] limitations from a treating physician." *Tankisi*, 521 F. App'x at 34. "In essence, *Tankisi* dictates that remand for failure to develop the record is situational and depends on the circumstances of the particular case, the comprehensiveness of the administrative record, and ... whether an ALJ could reach an informed decision based on the record." *Holt v. Colvin*, No. 3:16 CV 1971(VLB), 2018 WL 1293095, at *7 (D. Conn. Mar. 13, 2018) (internal quotations and citations omitted).

The "sufficient evidence" standard is not often met in cases where there is no medical source statement. *See, e.g., Guillen v. Berryhill*, 697 F. App'x 107, 109 (2d Cir. 2017) (remanding for failure to develop the record where the ALJ did not obtain a medical source statement from the claimant's treating physician, and "[t]he medical records discuss her illnesses and suggest treatment for them, but offer no insight into how her impairments affect or do not affect her ability to work"); *Cordova v. Saul*, No. 3:19 CV 628(JCH), 2020 WL 4435184, at *4-5 (D. Conn. Aug. 3, 2020) (noting that a medical source statement was "[a]bsent from the record," identifying "important gaps," and holding that "the record should have included a medical source statement").

The existence of a medical source statement in the record is not dispositive, however. *See Delgado*, 2018 WL 1316198, at *7. Indeed, even where the record includes a medical source statement, courts occasionally will remand for failure to develop the record if the medical opinions on record do not sufficiently address a plaintiff's limitations. *See, e.g., Card v. Berryhill*, No. 3:18 CV 1060(AWT), 2019 WL 4438322 (D. Conn. Sept. 16, 2019) (remanding in part because the sole medical source statement on record from the claimant's physical therapist did not address inconsistencies in the record, and the ALJ did not seek clarifications or opinions from the claimant's treating physician); *Swanson*, 2013 WL 5676028 (remanding for failure to develop the record where the ALJ concluded that the

claimant had severe physical and mental impairments but the treating source's opinion accounted only for the claimant's mental limitations).

Importantly, *Tankisi* and its progeny, as well as cases interpreting an ALJ's obligation to seek medical source statements to adequately develop the record, address claims raised while the "treating physician rule" was in effect. The "treating physician rule" "of necessity dovetail[ed]" with an ALJ's obligation to develop the record in that it "mandate[d] that the opinion of a claimant's treating physician regarding the nature and severity of [the claimant's] impairments [ ] be given controlling weight if it [was] well-supported by medically acceptable clinical and laboratory diagnostic techniques and [was] not inconsistent with the other substantial evidence in [the] case record." *Hoehn v. Colvin*, No. 14 CV 6401L(DGL), 2016 WL 241365, at *2 (W.D.N.Y. Jan. 21, 2016). Since a medical source statement was likely to be afforded controlling weight under the "treating physician rule," an ALJ's failure to secure one was particularly problematic while the rule was in effect. *See, e.g., Delgado*, 2018 WL 1316198, at *7. The new regulations dispense with the requirement that an ALJ afford controlling weight to a medical source statement from a treating physician, provided that certain conditions are met. *See* 20 C.F.R. § 404.1520c (An ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s)."). Instead, an ALJ considers multiple factors when weighing a medical source opinion, the most important of which are supportability and consistency. *Id*.

Although the Second Circuit has yet to address how the regulation change impacts an ALJ's obligation to obtain a medical source statement and the substantial evidence standard, its holding in *Tankisi* controls. *See Angelica M. v. Saul*, 3:20 CV 727(JCH), 2021 WL 2947679, at *6 (D. Conn. Jul. 14, 2021) (citing *Tankisi*, 521 F. App'x at 33-34). A medical source statement is valuable in that it affords a physician the opportunity to explicitly assess a claimant's limitations and RFC, which are necessary components of a fully developed record, but an ALJ need not always obtain one. *See id*. Even where an ALJ does not afford controlling weight to a physician's treatment notes, a medical source statement is not required if the notes contain a comprehensive assessment of a claimant's RFC. *Tankisi*, 521 F. App'x at 33-34. It follows that, even where, as here, the "treating physician rule" does not apply, remand for failure to develop the record by neglecting to obtain a particular medical source statement depends on the circumstances of each case and is required only if the record does not otherwise "contain[ ] sufficient evidence from which an ALJ can assess the petitioner's [RFC]." *Angelica M*., 2021 WL

2947679, at *6 (citing *Tankisi*, 521 F. App'x at 34).

*Alex C. v. Kijakazi*, No. 322CV117MPSRMS, 2023 WL 2865103, at *14–16 (D. Conn. Feb. 16, 2023), report and recommendation adopted, No. 3:22-CV-0117 (MPS), 2023 WL 2706232 (D. Conn. Mar. 30, 2023) (footnotes omitted); *see also*, *Rucker v. Kijakazi*, 48 F.4th 86, 91 (2d Cir. 2022) ("Although an ALJ's opinion 'need not perfectly match any single medical opinion in the record,' it must nevertheless be supported by substantial evidence.") (*quoting Schillo v. Kijakazi*, 31 F.4th 64, 78 (2d Cir. 2022)).

As discussed earlier, the ALJ here purportedly relied on the medical treatment notes, which showed that Plaintiff's impairments never significantly affected his functioning, and that to the extent any limitation was found, it was only temporary and therefore did not meet the durational requirements for disability. The Court has reviewed the entire administrative transcript (ECF No. 7), consisting of 1,982 pages, most of which are treatment notes. To broadly summarize the treatment records for Plaintiff's physical impairments, they generally show that during the relevant period, Plaintiff frequently sought treatment, at the hospital emergency room and the office of primary care physicians, for acute problems such as abdominal pain, falling down stairs, a dog bite, etc., during which physicians performed physical examinations that were mostly, if not entirely, normal. That is, the physicians examined Plaintiff and affirmatively indicated that they found no physical problems or limitations, other than the particular acute issue about which he was complaining.

For example, On November 24, 2014, Plaintiff went to his doctor complaining of "diffuse lower back" pain. (Tr. 746). Plaintiff indicated that his back had been painful since about

November 6, 2014, when he had been lifting boxes at his job in an auto body shop.   Apart from his complaint of back pain, Plaintiff's examination was normal, including "normal mood and affect." (Tr. 747).   Plaintiff was prescribed cyclobenzaprine to take as needed, along with ibuprofen, for muscle spasms. (Tr. 753).

On December 28, 2014, Plaintiff returned to the doctor, complaining that he was unable to walk or move due to increased lower back pain . (TR. 783) ("Pain is 10/10 at worst and he is unable to walk or move."). The doctor noted that Plaintiff appeared to be "in no acute distress," and that his back was "nontender to palpation." (TR. 785). The doctor noted that Plaintiff admitted to taking narcotic medications prescribed to family members. (Tr. 785) ("Discussed that we will not be prescribing narcotics due to use of his mother's meds [Percocet].").   The doctor offered to arrange an x-ray of Plaintiff's lower back, but added that he did not think it would be helpful, stating, "x-rays order; can get if wants to but unlikely to add to our differential [diagnosis]." (Tr. 785).   Plaintiff declined a referral to a physical therapy, since he felt that it had not been effective for him in the past.   Plaintiff reportedly indicated that he would go to a massage therapist instead. (Tr. 798).

On March 9, 2015, Plaintiff called his doctor complaining of "piercing pain" in his left side, with "pain level close to 10/10." (Tr. 801).   Plaintiff indicated that the pain made him unable to work at his job as an automobile detailer. (Tr. 813).   Plaintiff stated that he had been having back pain for ten years, but that it had not bothered him much lately. (Tr. 814).   Plaintiff also complained of having diarrhea.   Upon examination the following day, March 10, 2015, the doctor reported some pain in the left lower abdomen, which did not appear to be related to Plaintiff's past complaint of back pain.   Otherwise, the physical exam was normal, including that

Plaintiff appeared to be "in no apparent distress," with full strength and stable gait.   The doctor's impression was possible mild diverticulitis. (Tr. 827).   However, ultrasound testing of the abdomen was normal. (Tr. 809) ("Impression: Normal abdominal ultrasound.").

On March 7, 2016, Plaintiff complained to his doctor about a painful dermatological lump on his jaw. (Tr. 846).   Plaintiff also complained that he had been having coughing spells that would cause him to fall to the ground and be "unresponsive." (Tr. 846).   The doctor noted that Plaintiff had "a long history of smoking," and that the spells appeared to be related to coughing rather than to seizures. (Tr. 846, 848).[29]   Plaintiff's lab results were normal. (Tr. 861).

On May 10, 2016, Plaintiff went to the doctor complaining primarily of insomnia, stating that he would stay up all night on nights when he did not have to work the following day. (Tr. 872). Plaintiff also indicated that he had been "work[ing] on a conveyor belt for the past 6 weeks," which was causing pain in his neck. (Tr. 872).   Plaintiff also complained of "blacking out" after coughing.   Upon examination, the doctor noted only "muscle tens[ion] in the left neck" that did not radiate into the arms.   Regarding Plaintiff's insomnia problem, the doctor advised him to "cut down on alcohol use" and to "try to identify triggers for difficulty sleeping."   As for Plaintiff's work-related neck pain, the doctor "reassured" Plaintiff that he had "no weakness or radiculopathy." (Tr. 874).   Further, the doctor indicated that the "blacking out" spells were related to Plaintiff's smoking-related coughing spells, and that Plaintiff should quit smoking. (Tr. 891) ("Coughing spells causing syncopal episodes[.]").   The physician told Plaintiff that he could take ibuprofen

---

[29] One of the errors alleged by Plaintiff in this action is that the ALJ erroneously stated that Plaintiff "sustained several falls, mostly related to his drinking, not seizures." (Tr. 23).   Plaintiff indicates that only one fall was related to intoxication.   However, the Court views such error as harmless, since the record indicates that Plaintiff did not actually have seizures, and that any such episodes were very sporadic and caused by coughing fits brought about by smoking.

and/or cyclobenzaprine as needed for pain and muscle spasms.

On January 6, 2017, Plaintiff went to the doctor complaining of pain, numbness and tingling in his left hand. (Tr. 895). Plaintiff indicated that he had developed cellulitis in the hand "secondary to a cut that he sustained while washing pots and pan during his [recent period of] incarceration." (Tr. 898).   Imaging of the hand was negative for any fracture or dislocation, and the doctor's impression was that there was a "subchondral cyst." A physical examination was essentially normal, including full muscle strength and "good grip strength" bilaterally. (Tr. 899).

On February 15, 2017, a physician noted that Plaintiff reported a prior history of neck surgery and shoulder surgery, but a physical examination was unremarkable, except for possible left-hand "low-grade carpal tunnel symptoms.". (Tr. 342; 354).

On March 29, 2017, Plaintiff was examined at an emergency room for possible appendicitis, but, apart from abdominal pain, his physical and psychiatric examinations were normal, including "no distress," "normal range of motion" in the neck, "negative for back pain," and "normal mood and affect."[30] (Tr. 364-366, 1179-1181).   Plaintiff indicated that he "drinks alcohol" and "uses illicit drugs." (Tr. 1179).   Diagnostic testing for appendicitis was negative, and the doctors' impression was "possible colitis." (Tr. 1184).   Plaintiff was discharged in "good condition." (Tr. 1221).

On April 5, 2017, had a follow-up visit for abdominal pain and diarrhea.   A physical examination was normal, except for abdominal pain. (Tr. 1237).

On June 15, 2017, Plaintiff reported having gastrointestinal discomfort, though a physical

---

[30]  The examination finding of "normal mood and affect" is notable since, although Plaintiff ostensibly was seeking treatment for abdominal pain, he also claimed to be experiencing significant symptoms of depression.   However, the treating staff evidently did not observe symptoms of depression. (Tr. 1158, 1166).

examination was normal, including findings of "no distress," "no confusion [or] depression," "appropriate affect," "no myalgias," "no focal numbness, weakness, tremor," and "no gross motor deficits." (Tr. 381-82, 1303-1304).   The doctor opined that Plaintiff's gastrointestinal symptoms could be related to various causes including gallbladder disease or gastritis. (Tr. 1306). Subsequent endoscopy testing was negative. (Tr. 1346, 1388).

On August 21, 2017, Plaintiff continued to complain of abdominal gastrointestinal pain, especially after eating sugary foods, but a physical examination was again normal, with reported findings including "no distress," "no joint pain or myalgias," and "no motor deficits." (Tr. 388-389, 1416-1418).   The doctor opined that Plaintiff might have small intestinal bacterial overgrowth ("SIBO"), but Plaintiff declined the testing to confirm that diagnosis. (Tr. 1418).[31]

On September 27, 2017, Plaintiff sought treatment for an earache, though apart from ear pain, Plaintiff appeared "well," comfortable" and "in no acute distress," with "normal strength," "normal gait," and "appropriate affect." (Tr. 395-396).

On March 14, 2018, Plaintiff complained of neck pain radiating into his right arm, along with numbness and tingling in his right hand. (Tr. 403).   Physical examination found muscle spasm in the trapezius, but was otherwise normal, including "normal range of motion," including full range of motion and strength in the right arm, as well as normal mood and affect. (Tr. 405).

On April 20, 2018, Plaintiff sought treatment, complaining of depression, neck pain, numbness in the right side of his head, ear pain, shortness of breath, chest pain and abdominal pain. (Tr. 428).   However, apart from abdominal tenderness and tenderness in the right

---

[31] The glucose hydrogen test would have involved Plaintiff drinking a water and glucose solution, and he feared that ingesting glucose might make him feel ill.

shoulder, the physical examination was normal, with findings including "no distress," "normal range of motion," "no respiratory distress," and "normal mood and affect." (Tr. 429).

On May 22, 2018, Plaintiff sought medical care for "occasional chest pain" and "chronic neck pain," but the examination was again normal, including findings of "negative for back pain, neck pain and myalgias," "negative for shortness of breath," and "negative for depression." (Tr. 431-432).

On June 22, 2018, Plaintiff had an annual physical examination with his primary care doctor. (Tr. 416). Upon examination, findings included "no joint pain," "no numbness," "no anxiety or depression," "normal muscle tone," "no focal weakness," and "steady gait." (Tr. 419).   The examiner's primary positive finding, apart from substance abuse, was "mild intermittent asthma without complication." (Tr. 420).

On September 27, 2018, Plaintiff went to the emergency room complaining of a cough. (Tr. 1640).   Notably, Plaintiff indicated that he had been experiencing cough and shortness of breath for just one day. (Tr. 1642).   Plaintiff claimed to be homeless. (Tr. 1642).   Physical and mental status examinations were normal, including normal range of musculoskeletal motion and "normal mood and affect." (Tr. 1642).   Physical examination was also "negative for arthralgias [(joint pains)] and myalgias [(muscle pains)]." (Tr. 1641).   The doctor's impression was "viral illness." (Tr. 1642).

On October 19, 2018, Plaintiff went to the emergency room, complaining of right-sided neck pain and back pain after falling down a set of stairs. (Tr. 1493) ("Patient reports yesterday evening he had fallen down ~10 stairs.   Patient reports that he was standing at top of stairs talking with his wife when he suddenly fell backwards.   He does not remember the remainder

of the incident."). Plaintiff indicated that he was not sure whether his wife had pushed him down the stairs. (Tr. 1499) ("Patient reports that he 'may or may not' ha[ve] been pushed down stairs by his wife. . . . He would not elaborate any more on the situation."). Plaintiff denied using alcohol or drugs. (Tr. 1493). A physical examination was essentially normal, except for tenderness in the neck and lumbar region, though Plaintiff still had normal range of motion in his neck and back. (Tr. 1495). Plaintiff's doctor noted that he was "ambulating around [the] unit" "without difficulty" "in no apparent distress" and displayed "no neurological deficits." (Tr. 1498, 1500). Plaintiff came to the ER wearing a cervical collar, but the doctor removed it after finding that Plaintiff had no pain or reduced range of motion in the neck.[32] A CT scan of Plaintiff's head and neck was negative for any fracture or traumatic injury (Tr. 1520),[33] and Plaintiff was discharged with instructions to take Ibuprofen. (Tr. 1500). The discharge instructions indicated that to the extent Plaintiff was complaining of back pain, no cause for such pain had been found. (Tr. 1551) ("Despite our investigations today, the definitive cause of your back pain is still uncertain.").

On November 23, 2018, Plaintiff again went to the emergency department, complaining that he had fainted while using the toilet, and had hit his head on the bathtub.[34] Plaintiff also indicated that he had other episodes that same day of "body shaking." Plaintiff also stated that he had been experiencing pain in his left hip for the past month. (Tr. 1557). Plaintiff appeared to be in no acute distress, and a physical examination was essentially normal, except for

---

[32] Tr. 1498 ("C-collar removed following negative evaluation for midline neck tenderness and pain with ROM testing.").

[33] The CT scan did show preexisting degenerative changes in the cervical spine. (Tr. 1523) ("Varying degrees of multilevel spondylosis results in moderate to severe bilateral neural foraminal stenosis at C4-5 and C5-6.").

[34] The ambulance driver reported that, according to Plaintiff's "estranged wife," he did not fall in that manner, but, rather, "lowered himself to the ground because he became dizzy." (Tr. 1566).

tenderness, decreased strength, and decreased range of motion, in the left hip. (Tr. 1559). Plaintiff's mental status examination was normal. (Tr. 1559) ("Normal mental status. . . . He has a normal mood and affect."). Regarding the fainting episode, the doctor opined that it was possibly a "vasovagal episode," given that it occurred in close proximity to Plaintiff's use of the bathroom. (Tr. 1559).   Regarding the left hip symptoms, x-ray testing found "sequela of chronic avulsion injuries off the left superior and inferior spines.   Symmetric mild osteoarthritic changes in both hips.   Mild facet hypertrophy noted in the included lower lumbar segments. Mineralization is unremarkable for the patient's age.   Regional soft tissues are unremarkable." (Tr. 1581).   A CT scan of Plaintiff's cervical spine showed that the cervical fusion hardware installed in 2013 was still intact and providing adequate decompression of the spine.   The scan further showed degenerative changes above and below the C3-5 levels, with "mild spinal canal stenosis at C2-C3 and multilevel foraminal narrowing." (Tr. 1589).   Other testing (chest x-ray) further showed no acute cardiopulmonary disease. (Tr. 1590).

Plaintiff subsequently reported experiencing "right hip pain due to femoroacetabular impingement and labral tearing." (Tr. 1636).   On July 26, 2019, Plaintiff reported right hip pain, though upon examination he had normal range of motion and strength, except for slightly reduced flexion and abduction strength in the right hip. (Tr. 1916).   On February 4, 2020, Plaintiff had arthroscopic surgery on his right hip, to correct a "labral tear right hip, multiple subchondral cysts [in the] right femoral neck." (Tr. 1634-1635) ("labral repair, femoroplasty, acetabuloplasty, chondroplasty"); (1635) ("Postoperative diagnosis: Tear of right acetabular labrum.").   By late February 2020, Plaintiff told his physical therapist that his hip felt "ok," and the therapist indicated that Plaintiff was progressing. (Tr. 1905).

28

On May 9, 2020, Plaintiff sought treatment for a dog bite to his hand. (Tr. 1966). Except for the injury to his hand, the physical examination was normal, with notations that Plaintiff was "not in acute distress," had normal musculoskeletal function and range of motion of the neck, normal breathing, no weakness, normal gait, and normal mood and affect. (Tr. 1966-1967).

On this record, the Court finds that the ALJ's failure to obtain a formal opinion from a treating source was not reversible error under *Tankisi*, since the record already contained sufficient medical findings from which the ALJ was able to assess Plaintiff's physical functional abilities.

*The Alleged Failure to Obtain Missing Treatment Records*

Plaintiff next contends that "the record shows gaps in the treatment evidence," and that the ALJ therefore failed to develop the record by obtaining the missing treatment records, requiring remand.   However, the Court disagrees, since Plaintiff was represented by an attorney, the ALJ left the record open to afford a full opportunity to submit additional records, the attorney subsequently submitted additional records, and the attorney specifically advised the ALJ that all records had been submitted and that the ALJ should therefore issue his decision. On similar facts, the Second Circuit has found no error by an ALJ:

> To be sure, the ALJ's general duty to develop the administrative record applies even where the applicant is represented by counsel, but the agency is required affirmatively to seek out additional evidence only where there are "obvious gaps" in the administrative record. *Rosa v. Callahan*, 168 F.3d 72, 79 & n. 5 (2d Cir.1999). That is not this case. Eusepi does not contend that the ALJ lacked her complete medical history, and the administrative record was "adequate for [the ALJ] to make a determination as to disability." *Perez v. Chater*, 77 F.3d 41, 48 (2d Cir.1996). Indeed, at the conclusion of the hearing, Eusepi's counsel requested and obtained an additional two weeks to secure additional medical records. He subsequently submitted further records to the agency, representing that the matter was ready to

be taken under advisement by the ALJ. In these circumstances, we identify no error in the development of the administrative record.

*Eusepi v. Colvin*, 595 F. App'x 7, 9 (2d Cir. 2014).

Similarly, here the ALJ had what appeared to be, and what was represented by Plaintiff's attorney to be, Plaintiff's complete medical record.   Indeed, the ALJ here had even less reason to suspect that the record was incomplete than did the ALJ in another case, in which the Second Circuit still found no error by that ALJ in failing to develop the record. *See, Jordan v. Comm'r of Soc. Sec.*, 142 F. App'x 542, 543 (2d Cir. 2005) ("The ALJ fulfilled his duty to develop the administrative record. Although the ALJ did not contact or obtain records from Dr. Arena, a treating physician whom Jordan mentioned at his hearing: [i] Jordan's counsel volunteered to secure Dr. Arena's records; [ii] the ALJ kept the record open to allow counsel to do so, and later contacted counsel to remind him that no evidence had been received and that a decision would be made on the existing record unless such evidence was timely submitted; [iii] counsel subsequently contacted the Social Security Administration to advise it that Jordan had "nothing further to add" to the record; and [iv] Jordan did not request the ALJ's assistance in contacting or securing evidence from Dr. Arena. Under these circumstances, we cannot say that the ALJ failed to discharge his duty to develop the record.") (citation omitted).

Plaintiff, though, represented by new counsel, now insists that there were "obvious gaps in the record" that the ALJ should have developed.[35]   However, Plaintiff's argument on that point is largely speculative.   For example, Plaintiff asserts that there *may be* office notes from Plaintiff's primary care physician during the period July 2018 to August 2018, since Plaintiff was

---

[35]  ECF No. 8-1 at p. 20.

still a patient of the doctor during that period.[36]   Similarly, Plaintiff argues that there *might be* treatment records from a doctor and a physician's assistant, respectively, who are listed as having referred Plaintiff to physical therapy.   Finally, Plaintiff asserts that it is unlikely that the surgeon who performed his hip surgery (about which there are notes in the record) saw him only on that one occasion, and that some additional notes from the surgeon may therefore also be missing.   Plaintiff goes further and posits that the alleged missing records, assuming they exist, might contain evidence that Plaintiff is actually more limited than what the ALJ found, or that his impairment persisted longer than what the ALJ found. Indeed, Plaintiff asserts that the ALJ exploited the alleged gap in the record to find him not disabled, such as when he found that Plaintiff's right hip problem did not last twelve months. *See, e.g.*, ECF No. 8-1 at p. 13 ("The ALJ relied primarily on the gaps in the record to find Plaintiff's physical medically determinable impairments to be non-severe[.]").

However, the Court finds that such speculative arguments fall short of demonstrating that there were actual, obvious gaps which the ALJ failed to develop. *See, e.g., Derek W. v. Comm'r of Soc. Sec.*, 2022 WL 16856672, at *3 ("Plaintiff argues the record was missing treatment notations from Dr. Reyes; however, there is no indication these documents existed or what information the documents may contain. The 'theoretical possibility [that records exist] does not establish that the ALJ failed to develop a complete record.' *Morris v. Berryhill*, 721 F. App'x 25, 27 (2d Cir. 2018).").

Moreover, the Court does not agree that the ALJ relied primarily on gaps in the record to

---

[36] ECF No. 8-1 at p. 20 ("The most recent primary care treatment note was Dr. Shamsie's treatment note from June 22, 2018.   The other treatment notes show that Dr. Shamsie was still treating Plaintiff on August 27, 2018.").

find that Plaintiff's physical impairments were non-severe.   For example, with regard to the ALJ's finding that Plaintiff's hip impairment did not meet the durational requirement, the ALJ relied primarily on examination findings, which were inconsistent with Plaintiff's claim that he had been suffering from right hip pain for several years. (Tr. 21, 23).[37]   In that regard, on September 27, 2018, a physical examination found normal range of musculoskeletal motion, and was "negative for arthralgias [(joint pains)] and myalgias [(muscle pains)]." (Tr. 1641).   On October 19, 2018, an emergency room physician reported that Plaintiff was "ambulating around [the] unit" "without difficulty" "in no apparent distress" and displayed "no neurological deficits." (Tr. 1498, 1500).   And, on November 23, 2018, an emergency room physician reported that Plaintiff's physical examination was essentially normal, except for tenderness, decreased strength, and decreased range of motion, in the *left* hip (Tr. 1559), not the right hip upon which Plaintiff later had surgery, and that x-rays showed only "mild osteoarthritic changes in both hips." (Tr. 1581). Accordingly, the ALJ did not need to rely upon gaps in the record to find that Plaintiff's physical impairments were not severe.

### The Alleged Failure to Develop the Record Concerning Plaintiff's Mental Impairments

Plaintiff also contends that the ALJ failed to develop the record concerning his mental impairments, and, instead, "relied on gaps in the record to reject [his] allegations relating to mental functioning."[38]  Plaintiff alleges, for example, that some records were missing from Huther Doyle Substance Abuse Services.   Plaintiff further asserts that "the ALJ erred when failing to

---

[37] *See, e.g.*, ALJ's Decision (Tr. 23) ("The claimant reported that he had been having 3 years of right hip pain that failed conservative treatment.   However, in his September 2018 hospital admission, the claimant had normal range of motion and was ambulatory, which is not consistent with his allegations of long-standing hip pain.").
[38] ECF No. 8-1 at p. 25.

make his own independent requests for the missing Huther Doyle records."  However, this argument relating specifically to mental health treatment records is duplicative of Plaintiff's prior, more general, argument about missing records, which the Court found to lack merit, as discussed earlier.   Again, the ALJ did not fail to develop the record, since the ALJ left the record open, Plaintiff's counsel subsequently advised the ALJ that all records had been submitted and that the ALJ could issue his decision,[39] and there was no obvious gap in the record.

Related to his argument concerning development of the record, Plaintiff further alleges that the ALJ committed legal error when he "cherry picked the treatment notes relating to mental functioning to conform with his lay opinion that Plaintiff had no limitations resulting from his medically determinable mental impairments."[40]  In support of that contention, Plaintiff primarily cites various subjective complaints that Plaintiff made to his mental health therapists at the Catholic Family Center, which he contends the ALJ failed to discuss.   However, the Court does not agree that the ALJ improperly cherry picked the evidence in the manner alleged.   Rather, it appears that when discussing the mental health treatment evidence, including the records from the Catholic Family Center, the ALJ focused primarily on the reported findings and observations of the therapists, rather than on Plaintiff's subjective complaints to the therapists.

Nor does the Court agree with Plaintiff's contention that the ALJ "substituted his own lay opinion" for the opinion of consultative examiner Dr. Brownfeld.   Plaintiff maintains that the ALJ did so, since he found Brownfeld's opinion only partially persuasive. That is, Plaintiff maintains

---

[39]  Plaintiff's counsel fails to mention this fact, instead stating only that, "The record was held open, but the records were never submitted." ECF No. 8-1 at p. 25.   In any event, the Huther Doyle records were submitted to the Appeals Council, as noted earlier.
[40]  ECF No. 8-1 at p. 26.

that the ALJ erred by rejecting Brownfeld's statement that Plaintiff would be moderately limited in regulating emotions, controlling behaviors, and maintaining well-being. However, the ALJ explained his reasoning, noting that such moderate limitations were not supported by either Brownfeld's own examination report or by the other medical evidence.[41] (Tr. 24) (Indicating that Brownfeld's opinion concerning moderate limitations was "not consistent with the record or the actual exam.").

Nor does the Court otherwise find merit to Plaintiff's contentions that the ALJ committed legal error with regard to his evaluation of the evidence concerning Plaintiff's mental impairments.

### The ALJ's Decision is Supported by Substantial Evidence

Plaintiff also maintains that that the ALJ's decision is not supported by substantial evidence, particularly considering the low standard required for claims to survive step-two of the five-step sequential evaluation.   In that regard, the applicable standard for step-two determinations is well settled:

> According to the policy statement clarifying the step-two analysis, "[a] claim may be denied at step two only if the evidence shows that the individual's impairments ... do not have more than a minimal effect on the person's physical or mental abilit[ies] to perform basic work activities." Social Security Ruling ("SSR") 85-28, 1985 WL 56856, at *3 (1985). "If such a finding is not clearly established by medical evidence, however, adjudication must continue through the sequential evaluation process." *Id*. (emphasis added). Indeed, "the standard for a finding of severity under [s]tep [t]wo of the sequential analysis is *de minimis* and is intended only to screen out the very weakest cases." *McIntyre v. Colvin*, 758 F.3d 146, 151 (2d Cir. 2014) (citing *Dixon v. Shalala*, 54 F.3d 1019, 1030 (2d Cir. 1995)).

---

[41] Upon examination, Brownfeld reported no positive findings of any mental impairment or limitation. (Tr. 438).

*Schafenberg v. Saul*, 858 F. App'x 455, 456 (2d Cir. Jun. 22, 2021).

> "The claimant bears the burden of presenting evidence establishing severity." *Taylor v. Astrue*, 32 F.Supp.3d 253, 265 (N.D.N.Y. 2012), adopted, 32 F.Supp.3d 253 (N.D.N.Y. 2012). Step two's "severity" requirement is *de minimis* and is meant only to screen out the weakest of claims. *Dixon v. Shalala*, 54 F.3d 1019, 1030 (2d Cir. 1995). However, despite this lenient standard, the "'mere presence of a disease or impairment, or establishing that a person has been diagnosed or treated for a disease or impairment' is not, by itself, sufficient to render a condition 'severe.'" *Taylor*, 32 F.Supp.3d at 265 (quoting *Coleman v. Shalala*, 895 F.Supp. 50, 53 (S.D.N.Y. 1995)). Rather, "to be considered severe, an impairment or combination of impairments must cause 'more than minimal limitations in [a claimant's] ability to perform work-related functions.'" *Windom v. Berryhill*, No. 6:17-cv-06720-MAT, 2018 WL 4960491, at *3, 2018 U.S. Dist. LEXIS 176372, at *7 (W.D.N.Y. Oct. 14, 2018) (quoting *398 Donahue v. Colvin*, No. 6:17-CV-06838(MAT), 2018 WL 2354986, at *5, 2018 U.S. Dist. LEXIS 87554, at *15 (W.D.N.Y. May 24, 2018)) (alteration in original).

*Hastrich v. Comm'r of Soc. Sec.*, 366 F. Supp. 3d 388, 397–98 (W.D.N.Y. 2019).

The Court here finds that the ALJ's determination is supported by substantial evidence, and that Plaintiff did not carry his burden of proving that his impairments were actually more severe than what the ALJ found.   As discussed earlier, the record was replete with normal examination findings that are inconsistent with Plaintiff's claims of disability.   For example, and as discussed in more detail above, Plaintiff claimed to be disabled in part due to ongoing problems with his neck following surgery in 2014, but repeated examinations found no problems or limitations with his neck.   Moreover, despite Plaintiff's subjective complaints of mental health symptoms, including "anxiety," excessive worry," irritability," "short-term memory issues," and concentration difficulties," Dr. Brownfeld found "*no evidence* of limitation in understanding, remembering, and applying simple and complex directions and instructions, using reasoning and judgment to make work-related decisions, interacting adequately with supervisors, co-workers,

and the public; sustaining concentration and performing tasks at a consistent pace; sustaining an ordinary routine and regular attendance at work, maintaining personal hygiene and appropriate attire, and being aware of normal hazards and taking appropriate precautions." (Tr. 438) (emphasis added).   Moreover, the record refers to numerous normal mental status examinations during medical office and emergency room visits. (*See, e.g.*, Tr. 381-382, 395-396, 405, 419, 429, 431-432, 1559, 1642).

## CONCLUSION

For the reasons discussed above, Plaintiff's motion (ECF No. 8) for judgment on the pleadings is denied, and Defendant's cross-motion (ECF No. 10) for the same relief is granted. The Clerk of the Court is directed to enter judgment for Defendant and close this action.

So Ordered.

Dated: Rochester, New York
       August 30, 2023

ENTER:

CHARLES J. SIRAGUSA
United States District Judge